**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

| | | |
|---|---|---|
| **BRANDON KLEINMAN,** | § | |
| | § | |
| ***Individually,*** | § | **Cause No. ________________________** |
| | § | |
| ***v.*** | § | |
| | § | **JURY TRIAL DEMANDED** |
| **BLACKSTONE MEDICAL SERVICES, LLC,** | § | |
| | § | |
| | § | |
| ***Defendants.*** | § | |

**PLAINTIFF'S ORIGINAL COMPLAINT**

Plaintiff, Brandon Kleinman ("Plaintiff" or "Kleinman") sues the Defendant, Blackstone Medical Services, LLC ("Blackstone" or "Defendant"), and alleges as follows:

**I.**

**JURISDICTION AND VENUE**

1. This is an action for infringement of copyright pursuant to 17 U.S.C. § 101 et. seq. Subject matter jurisdiction is conferred by 17 U.S.C. § 501, 28 U.S.C. §§ 1331 and 1338.

2. Venue is proper in this district under 28 U.S.C. §§ 1391 and 1400(a) because Defendant is resident in this district and a substantial amount of the acts or omissions occurred here.

3. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367 because those claims are so related to Plaintiff's federal copyright claim that they form part of the same case or controversy.

**II.**

**PARTIES**

4. Plaintiff is an individual who resides and works, and at all material times has resided and worked, in the State of California in the County of Los Angeles.

5. Plaintiff is a seasoned software executive with a track record of founding numerous multi-million-dollar companies and leading teams through the full product lifecycle of operations, combining deep technical skill and strong strategic execution.

6. At all material times, Plaintiff worked as a software developer through his wholly owned company, Dopamine Research, LLC dba and aka Dopamine Partners, a California limited liability company ("DRP"), to deliver his services to various app developers.

7. Plaintiff is the author, owner and/or assignee of all rights that DRP has or had to each and every right or claim hereunder pertaining to the matters herein and the Agreement described *infra*.

8. Defendant is a limited liability company organized under the laws of the State of Florida whose principal business office is located at 550 N. Reo St. Suite 250 Tampa, Florida 33609. Its sole member, as trustee of the Vick Tipnes Revocable Trust, is Vick Tipnes, who is also a citizen of Florida, upon information and belief.

9. This dispute between Plaintiff and Defendant arises at the intersection of medical device technology and software engineering.

10. Plaintiff files this Original Complaint to bring claims for, among other things, infringement of copyright by Defendant, and others, of Plaintiff's proprietary source code. Plaintiff is the owner of proprietary software code (the "Code") specifically engineered to operate and integrate with Defendant's sleep apnea home testing device – Blackstone Sleep Health.

11. This software reflects years of expertise and know-how. It embodies unique, creative expressions of logical sequencing, data formatting, and interface protocols necessary to

effectively and efficiently bridge Defendant's hardware (which it buys off the shelf) with its reporting apparatus. Indeed, the only original functional aspect of Defendant's offering is Plaintiff's Code. Defendant gained access to Plaintiff's proprietary source code through a development relationship.

12. Rather than independently developing its own software or respecting the conditions and boundaries of its rights, Defendant chose a shortcut: it stole Plaintiff's copyrighted code.

13. Defendants' unauthorized integration of the Code into the Blackstone Sleep Health device and continued exploitation of it directly violates Plaintiff's exclusive rights under the Copyright Act, 17 U.S.C. § 106.

14. Because Defendant continues to market, distribute, and profit from software that impermissibly incorporates Plaintiff's creative and innovative work, Plaintiff files this action to protect its intellectual property, recover damages, fees and other relief, and enjoin Defendant's ongoing infringement.

## III.

## FACTUAL BACKGROUND

### A. THE AGREEMENT TO DEVELOP THE CODE

15. Defendant is in business of operating and selling a downloadable software application that is used with an otherwise off-the-shelf monitoring device, collectively known as "Blackstone Sleep Health" (the "App").

16. The App is presently available for download throughout the United States and world, via the Apple App store and at the Google App store.

17. Previously, Defendant had developed an app for use in conjunction with certain doctor prescribed sleep apnea equipment, that became non-functioning when, among other things, certain major updates in the Apple and Google app stores took effect, and the App needed substantial modifications (the "Old App").

18. However well the Old App worked, it stopped doing so when the relevant app stores introduced major coding changes that the Old App could not function with, requiring an overhaul of the Old App as well.

19. During the period of April 2024 through December 2024, Defendant engaged Plaintiff and DRP to deliver to Defendant coding and software development services in connection with Defendant's Old App, and, ultimately, what ended up being the Code at issue in this lawsuit for use with the current App.

20. Plaintiff's services were timely and fully delivered to Defendant at its request in the context of three phases that can best be described as follows: (1) the evaluation of Defendant's Old App, (2) the attempted repair of Defendant's Old App, and when that couldn't be accomplished, and (3) the creation of a new and original solution from scratch, comprising the Code and the App.

21. More specifically, during the period of April 2024 through October 2024, Plaintiff evaluated Defendant's Old App and its prospects for repair in respect of which Plaintiff posited various ideas for repair and matters to be evaluated further. In short, the Old App just did not work. Defendant had negative reviews and, upon information and belief, sales velocity fell precipitously.

22. During June and July 2024, Plaintiff attempted to implement his proposed ideas to fix what appeared to be wrong with the Old App, but the Old App could not be salvaged. Plaintiff and Defendant agreed it would need to be completely reformulated from scratch—e.g., with a completely new and original design and new software.

23. On or around October 15, 2024, DRP entered into a separate written agreement (the "Agreement") with Defendant to create a solution that ultimately became the Code. A true and correct copy of the Agreement is attached hereto as **Exhibit A** and incorporated herein.

24. Critically, the parties anticipated the issue here: the Agreement expressly covenanted who would own the intellectual property, and expressly conditioned Defendant's ownership of the Code upon Defendant's payment in full, stating:

> **Dopamine Research, LLC retains full ownership of all intellectual property until all outstanding balances are paid in full. If balances are not paid in full within a reasonable period, Dopamine Research, LLC retains the right to terminate any agreement.**

Exhibit A.

25. During the period of August 2024-December 2024, DRP created a new app from scratch.

26. The new work was not derived from the Old App. Its architecture, and the sequence, structure and organization of its modules, data flows and subroutines, were newly designed and written for Defendant. Like any Flutter application, it incorporates publicly available frameworks and packages.

27. Plaintiff's claim is to the original expression written for this project and to its structure, sequence and organization, not to those publicly available components.

28. In addition, the new back-end code operated with and on Defendant's servers and interface with the code on the App.

29. The Code was deployed in real time during its creation, thus giving Defendant immediate access to the Code, which continued.

**B. WHAT THE CODE ACTUALLY DOES**

30. Defendant offers patients a device paired with App to take an apnea diagnostic sleep test at home instead of in a lab. There is little "off the shelf" or "scenes a faire" in the Code.

31. The Code is essential to Defendant's revenues.

32. Upon information and belief, Defendant typically gets paid by its customers' insurance companies.

33. If the App doesn't work, then it affects revenues in at least two ways: it can reduce or eliminate reimbursements, and it stifles growth and usage of the service.

34. Defendant's personnel informed Plaintiff that they wanted the Code to solve both of these fundamental problems.

***In Plain English***

35. In Plain English, the Code is the bridge between a sensor on a patient's finger, Defendant's servers, and the physician's or medical diagnostician's device.

36. The patient or physician fills out an order form from Blackstone's website: https://www.blackstonemedicalservices.com/home-sleep-study/



37. The patient receives the physical device to put on their finger while they sleep: https://www.blackstonemedicalservices.com/home-sleep-study/

38. Blackstone advertises that its device acts as a 6-channel diagnostic tool tracking "Oxygen Saturation ($SpO_2$): Drops in blood oxygen levels that signal a pause in breathing. Pulse Rate (BPM): Heart rate spikes, which commonly occur when the body is jolted awake by a lack of oxygen. Respiratory Effort: How hard your chest or airway is working to pull in air. Snoring & Body Position: To track if breathing issues are exacerbated by sleeping on your back." https://www.blackstonemedicalservices.com/home-sleep-study/

39. But in order for that device to work, it has to be connected to an App on the patient's phone (which they download from the Google or Android App Store), which in turn connects the device's output readings to Blackstone's servers and streams the data throughout the night. The Code enables this functionality.

40. Each new Patient downloads the App, and then creates a profile by logging in with

their patient ID and birth date.

41. The Code accepts this and verifies it against background patient data. The Code causes HIPAA paperwork to be sent to the App where the patient signs it on screen, and the App sends the paperwork back to the Code to add to the patient's file.

42. The Code then causes the App to pair via Bluetooth with a small medical sensor (a pulse oximeter type device).

43. While the patient sleeps, the App listens to the sensor in real time, reading raw signals for blood oxygen, pulse, and heart activity many times per second, and translates the device's proprietary data stream into usable readings. The Code enables each step of this functionality.

44. At the end of each night of testing (which is typically two-to-three nights per patient), the Code causes the App to package everything into the standardized file format sleep physicians use (EDF), then securely sends it to the Defendant's cloud destination and on to the medical records system so a doctor can read and score the study.

45. Without the Code, the company cannot collect, package or deliver test results. Each time a new patient downloads the App a portion of the Code is copied onto the patient's phone.

46. Each time the App communicates with Defendant's back-end servers to collect the data, the servers fire up a copy of the Code to meet the new user, adapt the data for the user account, accept the streamed data, and then interface with the App to package the data, send it along to its designated destination(s).

***Technical and Functional Explanation***

47. The Code is the secret sauce that makes it all work—the invisible plumbing: speaking the sensor's private Bluetooth language, converting raw signals into a medical grade file format, verifying patient identity against medical records, and moving protected health data through multiple systems without losing or corrupting it.

48. Functionally, the Code essentially does the following:

a. **Authentication.** A patient downloads an App and enters their Patient ID and date of birth. Custom Firebase Cloud Functions validate those credentials and generate a custom authentication token. The Code integrates the app with an external medical API (referenced as BS_API_URL) using OAuth2, and handles HIPAA document signing and consent tracking across five distinct legal documents, with consent records stored in Firestore.

b. **Bluetooth device integration.** The app also implements a custom BLE protocol keyed to a specific service UUID with byte-level parsing of sensor data written to the

hardware manufacturer's documentation. It processes real time waveforms at a 125Hz sampling rate and recognizes devices by naming prefixes such as o2, si, and oxyfit.

c. **Data recording and processing.** The Code allows the app to collect multi-channel physiological signals (PPG, heart rate, SpO2) from the connected device, stores them locally on the phone, and converts them into EDF (European Data Format) files, the medical standard format, using a custom built Flutter plugin that supports multiple signal channels and configurable headers. EDF generation runs in isolates so the UI stays responsive.

d. **Upload pipeline.** Finished EDF files are then uploaded to Firebase Storage with Code-generated metadata written to Firestore, and data also flows to the external medical API. The pipeline is multi-stage (local, then Firebase, then the external API) with validation at each stage, automatic retry and error recovery, and cleanup of temporary files.

49. There is a full audit trail for data operations.

### C. Defendant Did Not Pay for the Code But Used it Anyway

50. On or around January 6, 2025, after the code had largely been created, Plaintiff sent Defendant notice that payment was due for the Code.

51. Under the Agreement, Defendant had no ownership of any intellectual property rights in the Code until it paid all outstanding balances in full. The agreement could be terminated if balances were not paid within a reasonable period. Defendant did not pay. Ownership therefore never passed to Defendant, and the termination right ripened and was properly exercised.

52. In response to the notices for payment, Defendant decided not to pay for the Code and effectively communicated that it would not be making payment.

53. Soon thereafter, Plaintiff registered the Copyright to the code (the "Copyright"). The Copyright was formally registered with the United States Copyright Office, Registration No. TX-9-487-258, with an effective date of registration of March 24, 2025.

54. The Certificate of Registration for the Copyright, identifying the work as "Sleep Tracking Application v1.0," and the Copyright Public Records System, is attached hereto as Exhibit B.

55. Then, on April 23, 2025, Plaintiff, individually and as sole member of and assignee from DRP, terminated the Agreement by written notice dated April 23, 2025.

56. Nonetheless, upon information and belief, Defendant has consistently used and profited from the exploitation of the Code ever since.

57. According to the Agreement, Defendant does not own the Code. All rights in the Code belong to Plaintiff.

58. Despite termination and Plaintiff's full rights under the terms of the Agreement, Defendant has failed to cease use of the Code and has unlawfully retained copies of it.

59. Plaintiff notified the App stores at Apple and Google to advise them of Defendant's infringement.

60. However, the take down notices were ignored. Defendant continues to copy, sell, distribute, exploit and monetize the Code and/or creating unauthorized derivative works based upon the essential features of the Code.

61. Each download of the App and use of it constitutes a discrete act of infringement.

62. Upon information and belief, Defendant has earned substantial profits from the unauthorized use of the Code, none of which has been shared with, or accounted to, the Plaintiff.

## IV.

## CLAIMS FOR RELIEF

### COUNT ONE
### (Copyright Infringement Against all Defendants)

63. Plaintiff incorporates herein by reference the factual allegations in Paragraph Nos. 1-62 in this pleading as if fully set forth herein.

64. Copyright protection attaches automatically the moment code is fixed in a tangible medium, such as being written and saved directly to a hard drive or server.

65. All conditions precedent have been performed, satisfied, or waived.

**OWNERSHIP**

66. Ownership of the intellectual property which includes all rights under the U.S. Copyright Act (17 U.S.C. § 101 et seq.) belongs exclusively to Plaintiff.

**INFRINGEMENT**

67. Defendant infringed the exclusive rights under 17 U.S.C. § 106(1).

68. Defendant's use of the Code during the parties' working relationship was permitted. That permission ended on April 23, 2025 upon termination of the Agreement. Defendant's

infringement commenced on April 23, 2025 and has continued since. To the extent any conduct of Defendant before that date is determined to constitute infringement, Plaintiff pleads such conduct in the alternative and seeks actual damages and Defendant's profits as to that conduct only.

69. Plaintiff alleges four types of copyright infringement: Literal copying, non-literal copying, creating derivative works, and distribution.

70. Each type of infringement can be proven through direct or circumstantial evidence.

***Literal Copying***

71. Literal copying means cutting and pasting proprietary code blocks, modules, or libraries (whether in whole or in material probative part) from a copyrighted program and embedding them directly into a software-related product without a license.

72. Source code has to be "compiled" into a language that is machine-readable, called "object code." 11 Nimmer on Copyright 721, at 721.7 (2019); *Evolution, Inc. v. Suntrust Bank*, 342 F. Supp. 2d 943, 947 n.3 (D. Kan. 2004) ("'Source code' refers to human-readable software code used by programmers to develop a software program. 'Object code' is machine-readable code that is a series of 1s and 0s. Source code is converted into object code through a process called 'compiling.'").

73. Directly copying the object code in whole or in part is a per se act of infringement.

74. Under the U.S. Copyright Act, source code and object code are protected as the same "work." 17 U.S.C. § 102. In 1980, Congress enacted the Computer Software Copyright Act of 1980. Act of Dec. 12, 1980, Pub. L. No. 96-517, Sec. 10, 94 Stat. 3015. It made software copyrightable in all of its guises. Now, a "computer program may be registered with the U.S. Copyright Office if it contains a sufficient amount of original authorship in the form of statements or instructions to a computer." 11 Nimmer on Copyright 721, at 721.7 (2019). *See also GCA Corp.*

*v. Chance*, No. C-82-1063, 1982 U.S. Dist. LEXIS 16554, at *4 (N.D. Cal. 1982) ("Because the object code is the encryption of the copyrighted source code, the two are to be treated as one work; therefore, copyright of the source code protects the object code as well."); *Midway Mfg. Co. v. Strohon*, 564 F. Supp. 741, 751 (N.D. Ill. 1983) ("the object code is nothing other than a direct transformation of a computer program composed, at considerable expense of creative effort, in source code, the evident Congressional policy determination that both forms of the computer program are protectible is an eminently sound one.").

75. Here, upon information and belief, the Code is substantially as it was when it was created.

76. Infringement by literal copying occurs every time someone downloads an App that contains relevant portions of the Code onto their phone, and/or every time someone accesses and/or launches the code (or its object code equivalent) to "run" the software and use it.

77. Therefore, every time a patient downloads the App, that act necessarily entails a literal copying of a material portion of the object code. Blackstone has kept the App on the official Apple App store and Google App store after termination and through this day.

78. Literal copying also occurs every time a customer interfaces with Defendant's servers and service using the App. Every time a patient uses the App—connecting it to Defendant's back-end systems to register a patient, stream data, transmit information or package it and send it along—it triggers a new copy of the object code on Defendant's servers to run specifically in conjunction with each patient's use, Defendant infringes the copyright.

79. As a simple matter of computer science, using code necessarily entails that a copy is created on the device or computer (usually in its Random Access Memory or "RAM"); doing so without an explicit or implied license means one has executed an unauthorized reproduction under

17 U.S.C. § 106(1). *See Wilcom Pty. Ltd. v. Endless Visions*, 128 F. Supp. 2d 1027, 1031 (E.D. Mich. 1998) ("…if the infringer launches the copyrighted program without authorization … [t]his creates a temporary copy of the program's object code in the RAM. When the computer is turned off, the copy disappears, but it is sufficiently 'fixed in a tangible medium of expression' to constitute an infringing copy under the Copyright Act.") (citing *Tricom, Inc. v. Electronic Data Systems Corp.*, 902 F. Supp. 741, 745 (E.D. Mich. 1995)).

80. This is not the case of a transient buffering because Defendant is neither an "owner" of a lawfully made copy within the meaning of Section 117 nor merely a passive conduit creating fleeting, unfixed buffer copies; rather, Defendant affirmatively downloads, retains, and repeatedly executes complete copies of the Code on its own servers and/or on patients' devices.

81. Plaintiff has dated copies from the official listings with hashes and screenshots of the store pages. Every time a customer downloads the App, an act of copying of material portions of the Code occurs.

82. Plaintiff thus pleads (at least upon information and belief) that there is literal copying of the Copyrighted Code.

83. Upon information and belief, there have been tens of thousands acts of literal copying of the Code by Defendant, the precise number of which will be established through discovery and at trial.

84. Once literal copying is shown through direct or circumstantial evidence, a plaintiff has no burden to show anything additional to establish liability.

***Non-Literal Copying***

85. For non-literal copying, an infringer like Defendant does not need to copy code word-for-word to breach the Copyright. Not even close. Something more abstract is sufficient.

86. Infringement can occur through, for example, code paraphrasing, which includes rewriting a proprietary program into a different programming language, or changing unimportant variable names, or manipulating nonfunctional features or formatting, typically in order to obscure the theft while maintaining the exact structural flow, logic paths, and architecture—which is what really matters.

87. Non-literal copyright infringement can also occur through something like "architectural plagiarism." That involves mirroring the highly specific, detailed structural layout of another program's modules, data flows, and subroutines. If the organization goes beyond mere base logic and thus reflects creative engineering choices, copying it constitutes infringement.

88. To demonstrate non-literal copying, one need only show (a) that Defendant had access to the code in a way that would have enabled them to copy it, and (b) that there is substantial, probative similarity between the Copyrighted code and the allegedly infringing code. Again, both can be demonstrated with direct evidence or circumstantial evidence.

89. The original software consists of highly creative, proprietary, and original source code, architectural frameworks, data structures, and a unique sequence, structure, and organization that are fully protectable under the Copyright Act.

90. Upon information and belief, if there is not literal copying, then that is only because Defendant has attempted to skirt the Copyright laws by engaging in Code Paraphrasing, Architectural Plagiarism, or some combination of both.

*Defendant Had and Still Has Access to the Actual Source Code—*
*And Not Just the Object Code*

91. At all relevant times, Defendant(s) had access to the Code because the Code was literally built into Defendant's system under the auspices of a contract and it was using the Code in real time as the Code was being built.

92. Defendant has continued to exploit (and thereby infringe) without the permission of Plaintiff the copyright in the Code and/or exploit matters derivative therefrom, and unless restrained, will continue to infringe such copyright.

*Defendant's Code is Substantially Similar in Probative Ways*

93. Plaintiff can look—and has examined publicly viewable portions of the compiled code and can tell that at a minimum, key elements of the structure, sequence, and organization of Defendant's application—including its inter-modular relationships, data flow hierarchies, parameter lists, and specific architectural logic—mirror the original creative engineering choices of the Code's original creator.

94. In other words, while some nonfunctional features may have been augmented or updated, highly specific aspects of Plaintiff's Code's functional and structural layout and architecture that drive the modules, data flows, and subroutines remain present in the shipped application, which is a later evolution of the same source tree.

95. The substantial similarity between the Copyright and the Defendant's code is evidenced by the presence of non-functional identical elements in Defendant's codebase—items that it would be a miracle to see through random or dumb luck. To the extent it can be viewed, Defendant's software reproduces unique variable naming conventions and identical formatting quirks, that are identical to those found in Plaintiff's copyrighted source code and serve no key engineering or operational purpose in Defendant's software.

96. Plaintiff's Code was written using the Flutter framework in the Dart programming language. The internal source file path strings the app uses for its own diagnostics, and the configuration files are bundled as assets. The compiled Dart snapshot in Defendant's shipped application contains internal source file path strings that map, file by file, onto the file tree of the

repository in which the Code was written, including lib/main.dart, lib/tasks/create_edf.dart, lib/models/ recording.dart, lib/models/recording.g.dart, lib/models/sample.dart, lib/scenes/home.dart, lib/scenes/ onboarding/login.dart, lib/components/app_container.dart, lib/helpers/api.dart and lib/helpers/ble_api.dart.

97. Defendant's shipped configuration carries the variable name SENTRY_SDN. The correct name, used industry wide, is SENTRY_DSN. That misspelling was authored in the Code and appears unchanged in Defendant's shipped build. Defendant's shipped configuration also uses the identical set of environment variable names, in the identical naming convention, as the configuration written for the Code.

98. Also, a source comment naming create_edf.dart – which is highly idiosyncratic and was in the original Code, also appears in Defendant's binary code operating its App. And its bundled configuration uses Plaintiff's exact variable schema.

99. These are key, indisputable markers that Defendant has been and still is using Plaintiff's code still.

100. Therefore, while these are evidence of literal copying, they are also evidence of nonliteral copying because Defendant's infringing software incorporates word, text, symbols, sequences, and distinct modules present in Plaintiff's copyrighted source code.

101. These constitute qualitatively vital and core components of Plaintiff's creative expression—and are not general off-the-shelf elements that one would find in every code set, rendering the works substantially similar in a highly material and probative way.

102. Upon information and belief, and in the alternative to the analogy of literal copying, any of Defendant's superficial modifications to the literal text of the code are actionable. Defendant's infringing software exhibits comprehensive (even if non-literal) similarity to Plaintiff's copyrighted work.

103. These similarities are highly probative and are unlikely to arise randomly or by pure chance. The idiosyncratic non-functional errors in the code (errors that don't affect how the Code works) prove that the code Defendant is using is still Plaintiff's Code.

104. An objective, analytic comparison of the two codebases utilizing expert testimony and forensic software tools will demonstrate that the protectable architectural elements, logic paths, and structural layers of Defendant's software are substantially similar to Plaintiff's copyrighted work.

## INFRINGEMENT BY UNLICENSED CREATION OF DERIVATIVE WORKS

105. Copyright infringement includes creating unlicensed derivative works.

106. Under the Copyright Law, only the owner has the right to adapt or modify the code. Infringement also occurs when a user modifies a copyrighted codebase into something else without

an explicit grant of rights from the owner of the copyright ("Derivative Infringement").

107. The unlicensed use of the code to create derivative works separately infringes one of the exclusive rights of a copyright holder under 17 U.S.C. § 106(2).

108. To the extent Defendant contends it is not using the same code, Plaintiff, upon information and belief, points to the current binary, which retains the file tree, models, scenes, components and helpers of the original Code, with additional files layered on top of that same tree and under the same namespace

109. The Code consists of highly creative, proprietary, and original source code, architectural frameworks, data structures, and a unique sequence, structure, and organization (SSO) that are fully protectable under the Copyright Act.

110. The components that produce every billable interaction with each customer, the sensor ingestion, the EDF creation, and the upload pipeline into scoring and billing, etc., are the original Code.

111. Upon information and belief and based on observation, Defendant's software is a derivative work, at best.

**INFRINGEMENT BY DISTRIBUTION AND/OR INDUCING OTHERS' INFRINGEMENT**

112. Defendant also infringed Plaintiff's exclusive distribution right under 17 U.S.C. § 106(3) by publicly distributing the App containing the Code without authorization and putting it on the Google and Apple App stores.

113. The "Blackstone Sleep Health" App has remained continuously available for download on the Apple App Store and Google Play Store at all times relevant to this action, including after the termination of the Agreement on April 23, 2025.

114. On July 9, 2025, Plaintiff notified Apple of Defendant's infringement and requested that the App be removed from the Apple App Store. Apple directed Blackstone to the complaint on or about July 17, 2025, but Blackstone refused the request to remove the App.

115. The App has remained continuously available for download since Blackstone's refusal to remove the App notwithstanding Apple's take down notice, as reflected in Plaintiff's dated captures and cryptographic hashes of the App store listings.

116. Each download of the App by a member of the public constitutes a separate act of unauthorized distribution under 17 U.S.C. § 106(3), independent of and in addition to Defendant's unauthorized reproduction of the Code.

117. Under the Supreme Court's *MGM Studios, Inc. v. Grokster, Ltd.*, 545 U.S. 913 (2005) decision, Defendant is liable for distributing the Code with the intent of promoting its use to infringe Plaintiff's copyright is liable for the resulting direct acts of infringement by end-users.

118. Because defendant actively took the Code in the App, submitted, and maintained the App, that intentional act satisfies the "volitional conduct" requirement for direct infringement when an end-user executes the code.

119. Similarly, because Defendant has the legal and practical ability to control or stop

the infringing activity (e.g., the power to pull the app from the app stores, revoke API access, or push an app update removing the code), and because Defendant derives a direct financial benefit from the end-user's engagement with and execution of the App, Defendant is vicariously liable.

120. Accordingly, to the extent end-user downloads the resulting RAM executions when a user uses the App and the Service are deemed direct acts of infringement by the end-users (e.g., by Defendant's customers), Defendant is at minimum secondarily liable for intentionally providing the software, inducing its download, and directly profiting from its execution.

**DEFENDANT'S WILLFUL INFRINGEMENT**

121. Given the obvious use by Defendant of the Code knowing that it did not own the Code, the manner in which Defendant obtained the Code, and Defendant's continued use of the Code despite Plaintiff's termination notice, and multiple written notices after that, constitutes willful infringement within the meaning of 17 U.S.C. § 504(c)(2), entitling Plaintiff to enhanced statutory damages.

122. Moreover, Blackstone explicitly refused Plaintiff's requests to remove the App from the Apple App Store on and after July 17, 2025, which further establishes willfulness under 17 U.S.C. § 504(c)(2).

**REMEDY**

123. Plaintiff is entitled to an accounting and disgorgement of all profits attributable to Defendant's infringement.

124. Plaintiff has notified Defendant and the app stores that Defendant is infringing the copyright in the Code as aforesaid.

125. Upon information and belief, Defendants have full knowledge that their conduct is wrongful and unlawful have continued to infringe said copyrights and intend to continue infringing

such copyrights.

126. Unless Defendants are enjoined temporarily and permanently by this Court from continuing their wrongful exploitation of the Code, Plaintiff will suffer irreparable harm.

WHEREFORE, Plaintiff respectfully seeks all damages, restitution, attorneys' fees, costs, disgorgement, injunctive and other allowable legal and equitable relief and to the extent proper declaratory relief that Defendant has no rights to the Code.

## COUNT TWO
## (Claim For Declaratory and Injunctive Relief Against All Defendants)

127. Plaintiff incorporates herein by reference the factual allegations in Paragraph Nos. 1-62 in this pleading as if fully set forth herein.

128. A real and substantial controversy exists between Plaintiff and Defendant regarding the ownership of the copyright in the Code delivered by Plaintiff to Defendant and/or the right to use said Code.

129. Defendant has asserted, directly or indirectly, rights of ownership and/or use in the Code and all works derived therefrom, which Plaintiff disputes.

130. There is no basis for Defendant's use of the Code.

131. There is no basis for any express or implied claim by Defendant to use the Code for any reason.

132. Plaintiff respectfully contends that, pursuant to the parties' contract, full ownership of the copyrights in the software, including all rights under the U.S. Copyright Act (17 U.S.C. § 101 et seq.), resided in DRP and in Plaintiff as a work for hire beneficiary and/or as assignee, until Defendant paid for DRP's services as required by the Agreement.

133. Any right Defendant had to use the Code was conditional upon payment in full, and

that condition was never satisfied. Plaintiff, individually and as sole member of and assignee from DRP, terminated the Agreement by written notice dated April 23, 2025.

134. Defendant contends (or has taken actions inconsistent with Plaintiff's exclusive ownership, or otherwise denies Plaintiff's exclusive ownership).

135. An actual case or controversy exists within the meaning of 28 U.S.C. § 2201 because both parties claim ownership or use rights in the Code.

WHEREFORE, Plaintiff seeks a judicial declaration under the Federal Declaratory Judgment Act, 28 U.S.C. § 2201, and the Copyright Act, 17 U.S.C. § 101 et seq., that Plaintiff is the sole and exclusive owner of all right, title, and interest in the copyrights in the Code, and that Defendant has no rights therein, including derivative works derived therefrom.

**COUNT THREE**
**(Claim for Quantum Meruit, Unjust Enrichment, Common Law Disgorgement, Against Defendant)**

136. Plaintiff incorporates herein by reference the factual allegations in Paragraph Nos. 1-62 in this pleading as if fully set forth herein.

137. In the alternative, Plaintiff contends Defendant knowingly has accepted and benefitted from Plaintiff's Code, using Code in its business operations and/or software subsequently derived from the Code.

138. Defendant did not pay Plaintiff for such exploitation of the Code and commercialization of it, thereby unjustly enriching Defendant.

139. Plaintiff's quantum meruit and unjust enrichment claims are based on Defendant's separate promise and obligation to pay the reasonable value of Plaintiff's development services, an obligation that exists independently of, and requires proof of elements extra to, Plaintiff's rights

under the Copyright Act, including the parties' course of dealing and Defendant's acceptance of services with knowledge that payment was expected.

140. Plaintiff is entitled to recover payment for the reasonable value contributed by the Code under the legal doctrine of quantum meruit.

141. Defendant knowingly accepted and retained the benefits of the copyright at Plaintiff's expense without incurring the burdens.

142. Defendant's retention of these benefits without payment is unjust and inequitable.

143. In the event Plaintiff has no adequate remedy at law, equity demands that Defendant be required to make restitution to Plaintiff in the amount by which Defendant has been enriched.

144. Plaintiff has suffered pecuniary injury as a direct result.

## V.

## JURY TRIAL DEMANDED

145. Plaintiff respectfully demands trial by jury on all issues triable to a jury.

## VI.

## PRAYER AND CONCLUSION

146. All conditions precedent and prior required notices have been waived or satisfied.

WHEREFORE, Plaintiff prays for judgment against Defendants as follows:

a. Enter judgment for Plaintiff against Defendant for copyright infringement;

b. Declare that Plaintiff is the exclusive copyright owner of all right, title and interest in the copyright in the Code and that Defendant has no rights therein;

c. Order Defendant to account for all gains, profits and advantages derived by Defendant from its copyright infringement of the Code, and award Plaintiff actual damages and/or statutory damages pursuant to 17 U.S.C. § 504;

d. Award Plaintiff statutory damages, attorneys' fees and/or costs pursuant to statute or common law;

e. Grant declaratory relief regarding Defendant's lack of entitlement or rights in the Code, and/or preliminary and permanent injunctive relief pursuant to 17 U.S.C. § 502(a) and FRCP Rule 65 forbidding Defendant from further use or distribution of the Code or any work derived therefrom and pursuant to 17 U.S.C. § 503(b) issue an order for impoundment/destruction of all infringing copies of the Code and all works derived therefrom;

f. Award Plaintiff compensatory damages in an amount to be proven at trial and no less than the jurisdictional limit;

g. Award Plaintiff the reasonable value conferred under quantum meruit;

h. Award Plaintiff pre-judgment and post-judgment interest;

i. Award Plaintiff all other legal, equitable, or declaratory relief permitted by law; and

j. Award Plaintiff any and all other relief the Court deems just and proper.

Dated: August 14, 2026

Respectfully submitted,

**BERGER SINGERMAN LLP**
*Attorneys for Plaintiff*

2309 S. MacDill Avenue
Tampa, FL 33629
Phone: 813-498-4300
Fax: 813-572-3705

By: /s/*Raul Valles*
Raul Valles, Jr., Esquire (FBN 148105)
Email: rvalles@bergersingerman.com
Secondary: lknox@bergersingerman.com
Service: DRT@bergersingerman.com
Service: DRT@ecf.inforuptcy.com
Service: DRT@ecf.courtdrive.com

**SBAITI & COMPANY PLLC**

**Mazin A. Sbaiti**
*Pro hac vice forthcoming*
mas@sbaitilaw.com
**Kevin Colquitt**
*Pro hac vice forthcoming*
knc@sbaitilaw.com
3102 Maple Avenue, Suite 400
Dallas, Texas 75201
T: (214) 214-3400
F: (214) 853-4367